IN RE ESTATE OF WILLIAM MARLIN.
ESTATE OF WILLIAM MARLIN, APPELLEE, V. CLIFFORD W. MARLIN, APPELLANT.
299 N. W. 626

FILED JULY 25, 1941. No. 31047.

*William Morrow,* for appellant.

*Jack L. Raymond, contra.*

Heard before ROSE, EBERLY and YEAGER, JJ., and KROGER and ELLIS, District Judges.

ELLIS, District Judge.

Clifford W. Marlin, trustee under his father's will, filed his final report showing cash on hand in the sum of $5,743.91. To this report four of the heirs filed objections containing 14 specifications of breach of trust. Upon hearing the county court found that the trustee should be charged with the sum of $3,209.13 in addition to the amount as shown by his report. This amount was made up of a surcharge of $1,641.90 for crop rentals not reported and accounted for by the trustee, a surcharge of $550 for pasture rental not reported and accounted for, and a surcharge of $1,017.23 representing advances made by the trustee to pay taxes and similar charges for which the trustee had reimbursed himself.

The trustee appealed to the district court and after a trial in that court lasting four days and reflected in a bill of exceptions of 445 pages the court found that the trustee should be charged with the sum of $8,601.59 in addition to the amount as shown by his report and entered judgment accordingly. From that judgment the trustee has appealed

to this court and will hereinafter be referred to as the trustee.

William Marlin died November 4, 1922, leaving a widow and ten children. He left a will, the pertinent provisions of which are as follows:

"I direct that my said executor and trustee shall keep my estate safely and conservatively invested so as to yield the best possible income consistent with careful management and I direct that all the profits, interest and income of my estate shall be paid over by my executor and trustee to my wife, Amanda Marlin, as long as she may live and that the receipt of my wife, Amanda Marlin, for such payments shall be full and sufficient acknowledgment and discharge of my said executor and trustee.

"I further will and direct that my wife, Amanda Marlin, be permitted to occupy the family home and to have the use of all the furniture and appurtenances thereunto belonging as long as she may live, and,

"I further will and direct that in the event that the income from my estate be insufficient to provide a suitable living for my wife, Amanda Marlin, that my executor and trustee shall first collect all outstanding obligations due me and shall pay a sufficient portion of the same to my wife, Amanda Marlin, each year, together with the income from my estate to provide her with a suitable living and after the proceeds of said obligations due me have been exhausted, I direct my trustee to sell a sufficient amount of my real estate and to pay a sufficient portion of it each year, which together with the income will provide a suitable living for my wife (by a suitable living I mean as good a living as she is now enjoying), and I further direct that at the death of my wife, Amanda Marlin, that my trustee convey the residue of my estate to my children * * * share and share alike.

"This provision for my wife is to be in lieu of all right of dower or other interest in my estate. I authorize and empower my executor and trustee, or his successor in trust, to sell and dispose of all, or any, of the real estate or personal estate of which I may die seized or possessed at public or

private sale at such time or on such terms and conditions as he or his successor shall deem meet or proper for the purpose of providing funds to be used in providing a suitable living for my wife, Amanda Marlin, and to execute, acknowledge, and deliver all papers, writings, deeds of conveyance and transfers thereof."

Pursuant to the provisions of the will, the trustee entered upon the discharge of his duties and continued to do so until January 9, 1939, when he filed his final report in the county court. Amanda Marlin, the widow, died in March, 1936.

None of the specifications contained in the objections will be discussed herein except those upon which the court found in favor of the objectors and charged the trustee with additional liability and the latter will be discussed separately.

In a general way it may be said that the records kept by the trustee are sorely deficient in detail and therefore a most unsatisfactory aid to the court or any one else in the situation before us, it being apparent that because of the lapse of years memory is a poor reed upon which to depend for supporting details which ought to be available upon the accounting of any fiduciary. It may also be said that the trustee showed too little inclination to amplify his meager records, but chose rather to take a categorical position that the report of his stewardship was correct and those interested should take it as made.

We have not been favored by the parties with either argument or authority as to the burden of proof in the case. It may be well at this time to set out our view that the law on this point is as set forth in the following: "The law seems to be that, upon an accounting, the affirmative of establishing more assets than are acknowledged by the inventory or account of a personal representative is with the party objecting, but, where the assets are shown or admitted, the burden is upon the personal representative to account for their proper disposition." *In re Estate of Mall*, 80 Neb. 233, 114 N. W. 156.

Among the assets of the father's estate which came into the hands of the trustee was a promissory note of one George

Helzer which was secured by a real estate mortgage. This note was in the original principal amount of $3,000 and became due in 1922 before the father's death. The trustee's report shows that on March 12, 1923, he received as a payment on this note the sum of $882.20 and that on March 16, 1925, he received a further sum on this note of $604.20. On the latter date he executed a release of the mortgage. The objectors charged the trustee had received a further sum in excess of $1,700 on this item and had failed to account for the same. The evidence offered by the objectors to support this allegation was the testimony of Jesse Marlin that he had a conversation with his mother in the fall of 1925 in which his mother said, "Well, Jesse, Helzer paid your pa's note today," and that he asked her how much it was and according to his recollection she said $1,735.

Dora Rosenfelt, a sister of the trustee, also testified that she had a conversation with her mother in the fall of 1925 and that her mother told her, "Dora, Helzer paid for my note today," and that she asked her mother how much it was and her mother said 17 hundred and a few dollars, the amount of the odd dollars not being remembered by the witness.

The foregoing testimony was admitted by the trial court over the objection that it was hearsay, it not being shown that the trustee was present at the time of the conversation.

While it is not of great importance in passing upon the admissibility of this evidence, it should be noted that the statements of the mother make no mention of the trustee, do not purport to be repetitions of what he had told her, or otherwise assert that he had received the money. It does not purport to disclose an admission or statement by the trustee that he had received the money.

We think the objection was well taken and that this evidence ought to have been excluded.

In support of their contention that this evidence was properly received the appellees cite the following from 2 Wigmore, Evidence (2d ed.) sec. 1081: "When by the hypothesis of the party himself his title as now claimed *is identical* with that of any other person, * * * as a prior

holder, *the statements of that other person,* made during the time of his supposed title, are receivable against the party as admissions." (Italics ours.) It seems to us that the exception to the hearsay rule referred to by Wigmore has no application to the situation before us.

The rule which the objectors seek to apply is an exception to the "hearsay" rule justified on the theory that the admission was against the interest of the declarant (in this case Amanda Marlin) and that there is such privity between the declarant and the party against whom it is offered as to make the latter chargeable with it. By privity is meant a succession in rights. There must also and necessarily be involved a basis for assumption that the declarant had knowledge of the facts declared. The most frequent applications of the exception are in cases of admissions against their interests made by grantors or assignors while yet owners, where the party to the action is the grantee or assignee. In the case before us the alleged statement of Amanda Marlin was not an admission against her interest, and there was not that privity of estate or responsibility between her and the trustee which is the basis of the particular exception to the hearsay rule. The case of *Johnson v. Petersen,* 101 Neb. 504, 163 N. W. 869, illustrates the correct application of the exception.

In our view that this evidence was improperly admitted, the only evidence left to support the allegation of the objectors is that of Ben Marlin, a brother of the trustee and one of the objectors, who testified that in the fall of 1925 he had a conversation with the trustee and that the trustee in the course of that conversation told him that Helzer had finished paying off his mortgage and "the way I recollect it, it was $1,785." Ben also testified that his brother told him that the mortgage was paid off just prior to the conversation.

Against this evidence the trustee denied having such a conversation with his brother Ben, testified that the final settlement of the mortgage indebtedness was made through a local bank, that he received from the local bank a duplicate

deposit slip for the amount paid by Helzer, and that he executed a release of the mortgage on the date of the settlement, which was later filed. He further testified that the two amounts as shown by his report represented all the money he had received on the Helzer note and that he did not know how much had been paid on the note during his father's lifetime. This deposit slip was offered in evidence, but is missing from the bill of exceptions. The cashier of the bank where the settlement was made was called as a witness and identified the deposit slip as having been made by him, but he had no recollection otherwise about the transaction.

The record shows a statement by counsel for the objectors that they had subpœnaed Helzer, that he was not present and upon inquiry by the court that they did not know whether he would be available the next day. He did not appear as a witness.

On the basis of this evidence the trial court made a finding that the trustee should be charged with the sum of $1,513.60 as received on the Helzer note in addition to the amounts admitted in his report. It appears that this amount does not reflect the evidence of the objectors, but must have been arrived at by simply deducting the total of the two payments reported by the trustee from the original principal amount of the mortgage. To this amount was added interest at the rate of 6 per cent. per annum in the amount of $1,362.24, making a total surcharge against the trustee on account of this item of $2,875.84.

It thus appears that the evidence upon which the court is asked to make this surcharge against the trustee is most unsatisfactory and especially in view of the failure of either of the parties to procure the attendance or evidence of the debtor Helzer, whose testimony, it would seem, would be of great benefit and especially to the trier of the facts. The record shows without dispute that the release of this mortgage executed by the trustee was dated March 16, 1925, and filed for record a few days after that. It seems so unlikely that the trustee would have released the mortgage

before the debt was paid in full and therefore that Ben Marlin's testimony that the trustee told him he had collected an amount of over $1,700 some six months later is highly improbable. Incidentally the record shows that Ben Marlin did not pay his debt to the estate until 1937 and then only after the trustee had placed it in the hands of an attorney for collection. It is quite clear that his feeling toward his brother, the trustee, was not good. In view of the fact that the objectors had the burden of proof, upon consideration of the evidence bearing on this item *de novo* we conclude that the objectors did not sustain that burden of proof and that the trial court erred in the surcharge of this item against the trustee.

Among the other items of property belonging to the estate was a farm consisting of approximately 158 acres. Fifty-eight acres of this farm had the benefit of irrigation. Approximately 30 acres of dry land were tillable and the balance of approximately 70 acres consisted of dry pasture land. During all the period of his trusteeship, until this land was sold by agreement of the parties in 1937, the trustee farmed this land as a tenant of himself.

Among the objections was a specification that he had failed to pay and account for any rent on the 70 acres of dry pasture land. The dispute between the parties on this issue consisted of a dispute as to whether or not it was the custom in that community for a tenant of a farm of the character of this one to pay any rent for such dry pasture land, and, secondly, the rental value of these 70 acres for pasture purposes.

Much evidence was introduced by both sides on the two points in dispute and it would serve no good purpose to attempt to summarize that evidence. The issue between the parties on this item was purely one of fact, there being no question but what the trustee was bound to account strictly for the fair and reasonable value of the use by him of this part of the trust property. We have likewise considered this issue *de novo,* but we have also considered the fact that the trial court had the benefit of seeing and hearing the wit-

nesses and we conclude that the finding of the trial court ought not be disturbed. The trustee, therefore, was properly chargeable with an additional sum of $750 on account of pasture rent.

The objectors further alleged that the trustee had not completely and faithfully accounted to the trust for the landlord's share of crops raised on the tillable dry land and the irrigated acres. The evidence on this item in behalf of the objectors was furnished chiefly by the brother, Ben Marlin, who lived close by this farm and during the years not only had an opportunity to observe the crops growing thereon by reason of his close residence but also exchanged work with his brother in their farming operations.

Here again much evidence was intrduced pro and con and the question was purely one of fact. As indicated earlier herein, the trustee's records were most unsatisfactory and did not show in many cases the quantity or the price or the buyer of the crops raised on this land, which were sold to strangers, and in many cases he purchased the landlord's share of the crops from himself without any more satisfactory record of such transactions. We conclude that the trial court's findings that there was due from the trustee on this item the additional sum of $1,330.42 should not be disturbed. If there is any difference in the degree of care and accuracy with which a trustee should record and account for his handling of the trust property, which we do not concede, the higher degree of care and accuracy should be exercised in the case where the trustee is using the trust *res* for his own benefit and profit. If it could be said upon perfect proof of the actual transactions of the trustee in his use and rental of this farm that he has been charged with too much, he can have no one to blame but himself.

It appears that the widow was 65 years of age at the time of the death of her husband; that she was then living in a residence property in town and that prior thereto an unmarried daughter, Cora Marlin, had made her home with her father and mother. She continued to live with her mother after her father's death until the death of her mother,

at which time the mother was 79 years of age. At various times during the years that elapsed between the father's death and the mother's death the trustee was temporarily short of cash money to furnish to the mother for her living expenses. When such a shortage first occurred it was agreed between the mother, the trustee and his sister Cora that the latter should advance funds to provide for the mother's maintenance and that the trustee would reimburse her for such funds so advanced. On two different occasions the trustee, in recognition of the advancements made by the sister, gave her promissory notes signed by him as trustee, and after the last note was given, during the period from that time until the mother's death, the sister advanced further sums so that the aggregate of her advancements amounted to $2,627.70. In his final report the trustee credited himself by way of reimbursement for these advancements which had been made by the sister and which had been repaid by the trustee. The trial court found that a surcharge should be made against the trustee for the amount of this reimbursement.

To this credit by way of reimbursement objection was made on two grounds. The first is that in effect it amounts to maintenance of the sister out of trust funds and therefore was beyond the purpose of the trust and an unauthorized application of said funds by the trustee. The objectors further contend that in any event the sister Cora should have been charged with the fair and reasonable value of the food, lodging and other accommodations which she received while living in her mother's household.

The sister testified (and there was no evidence to the contrary) that during all of the time she lived with her mother she paid part of the grocery bill and on other items of the household expenses or made equivalent contributions to that common expense—all under an agreeable arrangement between her and her mother. She also testified that she performed services in connection with the operation and maintenance of the home such as tending the furnace and like tasks.

The record shows incidentally that William and Amanda Marlin were husband and wife for more than 45 years, during which they raised a family of ten children, and we may assume acquired the estate involved here. William Marlin made clear in his will his intention that the estate should be dedicated to the comfort and enjoyment of the one who had been his companion and helpmate through those years. We think he likewise negatived any idea that so far as her living and maintenance were concerned she should be confined to a budgetary strait jacket improvised by the remaindermen backed by the courts, but rather made it clear that she might maintain herself according to her own inclinations and in the way that would contribute most to her own comfort and pleasure. She, and not the remaindermen, was the prime beneficiary of this trust.

To contend that the testator's evident affectionate purpose did not include the comfort and pleasure, to say nothing of the material benefits, which Amanda Marlin would find in the companionship of one of her own flesh and blood, an unmarried daughter, and that she could not have that comfort and pleasure unless some one accounted to the remaindermen for its cost, has little appeal to a court of conscience. We find nothing in the will or the facts in conflict with our natural inclinations. What we have said disposes of the first basis for objection to this item.

It also appears that at various times during the operation of the trust, when there was a shortage of cash funds, the trustee advanced his own funds in the sum of $1,017.23, all of which was used by him to pay general taxes and charges assessed in connection with irrigation benefits to the farm involved, and that in his report he credited himself for reimbursement of this amount. The objections challenged this item.

It should be here noted that no interest was charged in connection with this item or the advancements made to Amanda Marlin through Cora Marlin. The credits in both cases claimed by the trustee were limited to reimbursement of the actual principal amounts. Both the county court and

the district court sustained the objection to this item and ordered the trustee to account for the same. It may also be desirable to state that at the time these advancements were made the only assets of the estate, other than the real estate, consisted of debts owing to the estate by some of the children who were also remaindermen.

In connection with both the advancements made through Cora Marlin for the widow's benefit and the advancements made by the trustee in payment of taxes and irrigation charges, the objectors urge that the power of sale granted by the will was an exclusive and mandatory method by which the trustee could acquire necessary cash funds beyond those produced by way of income. While the will in question makes clear the intention of the testator that the widow shall not be dependent on the income of the estate alone for her support and empowers the sale of the corpus of the estate, it does not eliminate discretion on the part of the trustee as to the exercise of the power of sale. In paragraph 4, which more directly deals with the exercise of the power as distinguished from the testator's purpose covered in the preceding part, we find that it authorizes and empowers sale "at public or private sale at such time or on such terms and conditions as he * * * *shall deem meet or proper* for the purpose of providing funds." (Italics ours.)

The objectors cite several cases, among them *Arlington State Bank v. Paulsen,* 57 Neb. 717, 78 N. W. 303, all of which cases are included in the note in 92 A. L. R. beginning on page 882. As disclosed by an examination of the Nebraska case cited and as indicated by the annotator in A. L. R., the cases cited involved directly and turned on the precise question of the power and authority of a trustee to mortgage under a power of sale of a nature similar to that contained in the will of William Marlin.

It seems obvious that such cases can have no application to the situation before us, since no attempt was made by the trustee to mortgage or otherwise create a lien on the trust *res.* The reason most frequently given in the cases cited for denying the power to mortgage under a power of sale is the

resulting risk of loss of the property for only a small part of its value with the following loss to the beneficiaries of the trust. Neither such risk nor result appears in the case before us. The only risk appearing here is the risk assumed by the trustee personally that subsequent income experience would permit reimbursement.

The trustee in this case did not attempt to mortgage or otherwise pledge the assets of the estate for his reimbursement and did not assert or claim any lien on those assets. It appears to have been a simple transaction by which the trustee from time to time advanced funds which were applied strictly to the purpose of the trust or in preservation of the assets and for which he reimbursed himself with funds later coming into his hands in the normal operation of the trust. There is no dispute of the amounts. There is utterly no evidence or suggestion of damage or detriment to the remaindermen even by way of an interest charge.

So far as the advancements to pay taxes are concerned, no other result is shown or suggested save the conservation of the real estate assets for the benefit of the very persons who are now objecting thereto. In this connection we quote the following from 26 R. C. L. 1321, sec. 181: "It is the positive duty of a trustee to pay the taxes accruing against the corpus of the trust estate; and, if he has no funds of the estate in his hands, he may advance the necessary amount out of his own means. Such an advance becomes a charge on the property." We do not think this rule is affected by a power of sale in the trustee and especially where, as in this case, no damage is shown.

A very similar situation was involved in the case of *Smith v. Greeley*, 67 N. H. 377, 30 Atl. 413. In this case the testator had left real estate to the plaintiff as trustee with power of sale and direction to pay the income therefrom and, if necessary, such portion of the principal as he might deem best for the support and maintenance of a son. The trustee advanced considerable money and it also appeared that a stranger loaned the son money for his support. The action was by the trustee for directions. While the will was not identical

in its provisions with the will here involved, the court held that the trustee was entitled to reimburse himself, and that, if the loans by the stranger were made at the request of the trustee, they stood on the same footing as the advancements by the trustee.

We do not find it necessary to go farther than to hold, and we do hold, that in the situation before us the trustee was entitled to reimburse himself for the advancements made through Cora Marlin to the widow and for the advancements made in payments of taxes.

We therefore conclude that the judgment of the district court should be modified by eliminating therefrom the surcharges imposed except as to the surcharge in the sum of $750 on account of pasture rent and the surcharge in the sum of $1,330.42 on account of crop rent. Judgment should be entered accordingly in the district court.

In view of the fact that the trustee has been compelled to defend himself in both the district court and this court against surcharges, which it is now determined were erroneously made against him, he should not be required to pay all the costs, but we will leave this matter to the discretion of the district court.

AFFIRMED AS MODIFIED.